**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-603 (RC)** |
| **v.** | : | |
| | : | |
| **CHRISTOPHER MICHAEL** | : | |
| **CUNNINGHAM,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Christopher Michael Cunningham ("Cunningham") to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

### I.    Introduction

The defendant, Christopher Cunningham, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

On February 15, 2022, Cunningham pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 14 days' incarceration, with probation to follow, is appropriate in this case

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

because Cunningham: (1) entered the Capitol Building at approximately 2:20 p.m. through the Senate Wing Door, only seven minutes following the violent initial breach; (2) remained in the Capitol Building for an hour and a half; (3) trespassed through the Rotunda and both the Senate and House sides of the Building; (4) penetrated all the way to the Office of the Speaker of the House, close to where acts of violence and property damage occurred at the entrance to the House Chamber; (5) filmed his entrance into the Capitol and posted photos on social media of himself and the interior of the Capitol, including of the Speaker's Office; (6) is a former member of the United States Navy; and (7) is a recidivist offender of traffic laws who has served three short prison terms.

The Court must also consider that Cunningham's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Cunningham's intentional and sustained participation in the riot and breach of the Capitol, which actually succeeded in halting the Congressional certification, renders a sentence of incarceration both necessary and appropriate in this case.[2]

---

[2] The government recognizes that this Court has taken the position that the ongoing Covid pandemic generally militates against a term of imprisonment in misdemeanor cases arising out of the events of January 6, 2021. *See, e.g., United States v. Vic Williams*, 1:21-cr-00388 (RC), Tr. 2/7/2022 at 29; *United States v. Nicole Prado*, 1:21-cr-00403 (RC), Tr. 2/7/2022 at 39. As an initial matter, Defendant has not claimed that he personally suffers from any medical condition that puts him at particular risk of severe illness or death if he contracted COVID-19. The incidence of deaths and severe illnesses from Covid have substantially receded since the advent of vaccines and

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 23 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Cunningham's conduct and behavior on January 6.

*Christopher Cunningham's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Cunningham, traveled with another individual to Washington, D.C., from his home in Nashville, Tennessee to support President Trump at the planned "Stop the Steal" rally on January 6, 2021. *See* ECF 23 at ¶ 8.

After attending the rally at the Ellipse, Cunningham joined the crowd advancing on the U.S. Capitol.  Upon reaching the Capitol Grounds, Cunningham walked through the restricted area and up to the West side of the Capitol Building.  *See* ECF 23 at ¶ 9.  Cunningham entered the Capitol Building through the Senate Wing Door at 2:20 p.m., approximately seven minutes after other rioters smashed out a window immediately adjacent to the door using a two by four inch plank of wood and a riot shield, and then kicked open the door.  *Id.* ¶ 10. The U.S. Capitol was first breached in this location by a rioter who jumped through the window over the broken glass. *See* Image 1.

---

boosters. *See* https://www.aamc.org/news-insights/ba2-boosters-and-future-covid-19-vaccination. Sentencing courts, including judges of this Court, thus regularly sentence defendants to terms of imprisonment, and such a term is warranted here.  *See*, *e.g.*, Table 3, attached, indexing sentences imposed on other Capitol breach defendants.



Image 1

Approximately seven minutes after the entry depicted above, Cunningham, circled in red

in Images 2 and 3, entered the U.S. Capitol through the Senate Door while simultaneously filming

his entrance with his phone:





Images 2 and 3

For the next 90 minutes, Cunningham trespassed through the Rotunda, in the middle of the Capitol, and through both the House and Senate sides of the Building.  *See* ECF 23 at ¶ 9. Cunningham later posted photos on Facebook of himself and the interior of the Capitol Building, along with a video showing other rioters inside the Capitol. *See* ECF 23 at ¶ 12. Cunningham also posted on Facebook a photo of the sign and interior of the Office of the Speaker of the House, an area where visitors to the Capitol Building are not permitted even when it is open to the public:



Image 4

Open source photographs and video surveillance footage operated by the United States Capitol Police show Cunningham moving through the Capitol, including bring present when the East Rotunda doors were breached, and smoking a cigarette while inside the Building. *See* Images 5, 6, and 7.



Image 5



Image 6



Image 7

Around or shortly after 2:40 p.m., just minutes after the breach of the East Rotunda doors, Cunningham joined other rioters in surrounding a law enforcement officer (outfitted with riot gear) and keeping him sidelined and away from the doors while additional rioters streamed inside. *See* Images 8 and 9. Although Cunningham did not assault the officer, he certainly witnessed others shoving and pushing against the officer to keep him pinned along the wall. *Id.*





Images 8 and 9

Cunningham did not leave the Capitol until approximately 3:50 p.m., after spending 1 hour and 30 minutes marauding with others through the Capitol. *See* ECF 23 at ¶ 10. Cunningham

admitted that he knew at the time he entered the Capitol that he did not have permission to do so. *Id.* at ¶ 13.

*The Charges and Plea Agreement*

On August 30, 2021, Cunningham was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 31, 2021, he was arrested. On September 28, 2021, Cunningham was charged by four-count Information setting forth the same violations of Section 1752(a)(1) and (2) and 5104(e)(2)(D) and (G). On February 15, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Cunningham agreed to pay $500 in restitution to the Department of the Treasury. *See* ECF 22 at ¶10.

### III.    Statutory Penalties

Cunningham now faces a sentencing on a single count of violating 40 U.S.C. § § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Cunningham faces up to six months of imprisonment and a fine of up to $5,000. Cunningham must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a custodial sentence of 14 days' incarceration, followed by 36 months' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Cunningham's individual conduct, this Court should look to a spectrum of aggravating and mitigating of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled;

(7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Cunningham personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Cunningham's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants.

Cunningham entered the Capitol approximately seven minutes after it was first breached. He did so amid clear signs of violent entry. The window adjacent to the door through which Cunningham passed had just been smashed out. He would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm. The smell of deployed tear gas would have been unmistakable. Hearing the shouts and witnessing the skirmishes of other rioters would have been unavoidable. Yet unlike many other rioters, Cunningham did not leave the Capitol after 10 or 20 minutes – he chose to stay inside the Capitol and participate in the disorder for 90 minutes. That is significant because the police officers who were defending the Capitol and trying to prevent the rioters from gaining access to sensitive locations like offices where staff members were sheltering in fear had to try to keep control of every person inside the building for as long as they were there. For example, following the breach of the East Rotunda doors around 2:38 p.m., Cunningham joined other rioters in encircling and sidelining an officer while new rioters streamed through the doors.

Cunningham did not stop at the Rotunda, but instead moved deeper into the U.S. Capitol, trespassing through both the Senate and House sides of the building and trekking all the way to

the Office of the Speaker of the House, where he took photos.  Cunningham's subsequent posting of video and photos on social media of his January 6th exploits demonstrates that he was proud of the breach and wanted to share with others that the U.S. Capitol had been overcome by the rioters. Finally, in an act of celebration or defiance, or both, Cunningham smoked a cigarette inside the Capitol Building prior to his departure.

Accordingly, the nature and the circumstances of this offense establish the need for a short sentence of incarceration in this matter.

### B.  Cunningham's History and Characteristics

As set forth in the PSR, Cunningham has been incarcerated on three prior occasions for traffic infractions. ECF 24 ¶¶ 39, 42, 43. He has two other traffic-related convictions, including driving with a stolen license plate. *Id.* at ¶¶ 40, 41. The most recent of those occurred 8 years ago, when he was 39 years old. *Id.* ¶ 43.

Cunningham is self-employed in the construction industry and also works other jobs. *Id.* ¶¶ 62-63. He previously served in the United States Navy and was honorably discharged in 2010. *Id.* While Cunningham's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, Cunningham would have been well aware that he had no right to enter and trespass through restricted government grounds and buildings.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Cunningham's actions demonstrate the need for specific deterrence.  Throughout the afternoon of January 6, he joined with others to march upon, breach and overrun the Capitol. Cunningham was among the first wave of rioters to move up the West Front and breach the Capitol through the Senate Wing Door.  He filmed his entrance and posted photos on social media. Notwithstanding the visible violence, chaos, property damage, and disorder, Cunningham remained inside the Capitol for 90 minutes. And after the Capitol had been overtaken, after scores police officers and rioters injured and offices looted, Cunningham celebrated by smoking a

cigarette inside the Capitol. Although he admitted to his conduct, as of the date of this filing, Cunningham has not expressed any sincere remorse for his conduct.  Cunningham's voluntary and prolonged involvement with a violent mob, and his open flouting of law and order, demonstrates a need for specific deterrence in the form of a short period of incarceration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[5] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ( "I don't want to create the impression

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

that probation is the automatic outcome here because it's not going to be."); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Cunningham has pleaded guilty to Count Four of the Superseding Information, charging him with parading, demonstrating or picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how and when a defendant entered the Capitol, how long he remained inside, the locations visited, the posting of photographs on social media, etc.—help explain the differing recommendations and sentences.  And as that

discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the government has often sought and courts have often imposed jail time in misdemeanor cases involving defendants with entry into sensitive spaces. *See*, *e.g.*, *United States v. Andrew Ericson*, D.D.C. 21-cr-506 (TNM) (entered the suite of the Office of the Speaker; sentenced to 20 days' intermittent incarceration on consecutive weekends and 24 months' probation); *United States v. Michael Timbrook*, D.D.C. No. 21-cr-361 (TNM) (entered the suite of the Office of the Speaker; sentenced to 14 days' intermittent incarceration to be served on consecutive weekends and 12 months' probation); *United States v. Emily Hernandez*, D.D.C. No.

21-cr-747 (JEB) (entered the suite of the Office of the Speaker; sentenced to 30 days' incarceration and 12 months' supervised release).  The Court may also consider the sentences imposed in other misdemeanor cases involving early entry, prolonged trespass, the entering of sensitive areas, observing interference with police, and criminal history, including the cases of David Mish, Kelsey Wilson, and Jeremy Sorvisto who pleaded guilty to violating 40 U.S.C. §5104(e)(2)(G), and Nicholes Lentz who pleaded guilty to violating 18 U.S.C. § 1752(a)(1):

- David Mish, D.D.C. No. 21-cr-112 (CJN), sentenced to 30 days' incarceration and $500 restitution. Entered about 20 minutes after Cunningham and remained inside the Capitol for approximately 30 minutes. Stayed on the House side of the Capitol, took photographs, observed violence against police, and heard but did not witness a gunshot (within earshot of the shooting of Ashli Babbit). Did not enter sensitive areas, is not former military, and voluntarily surrendered, but has a lengthy criminal history including offenses more serious than Cunningham's.

- Nicholes Lentz, D.D.C. No. 22-cr-53 (RDM), sentenced to 30 days home detention, 36 months' probation, 100 hours community service, $500 restitution.  Former police officer who entered through the Senate Wing Door a few minutes after initial breach, remained inside for almost 1 hour, and broadcasted live on his Facebook page. No criminal history.

- Kelsey Wilson, D.D.C. No. 21-cr-578 (APM), sentenced to 30 days home detention, 24 months' probation, 60 hours community service, $500 restitution. Entered through the Senate Wing door approximately 11 minutes after the breach, entered the Office of the Speaker, and remained inside the Capitol for approximately 20 minutes.  When confronted by FBI, Wilson admitted to observing the riots, but denied entering the Capitol.

- Jeremy Sorvisto, D.D.C. No. 21-cr-320 (ABJ), sentenced to 30 days incarceration and $500 restitution. Entered through the Senate Wing Door 5 minutes after Cunningham, inside Capitol for 25 minutes, bragged about entry into the Capitol, and told others to delete or destroy evidence of his participation.  Also picked up litter and left when told to leave by law enforcement.

Although Cunningham's conduct on January 6 was more egregious than these cases in some respects, they provide useful comparisons and support the government's recommendation for a sentence of 14 days' incarceration, with probation to follow.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.

This Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," i.e., a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States*

*v. Caplinger*, 21-cr-342 (PLF), ECF 65 (D.D.C. June 7, 2022) (opinion concluding that split sentence is permissible). But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10).   Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (D.D.C. Feb. 17, 2022) (Howell, C.J.) (imposing imprisonment in 14-day period under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (D.D.C. Feb. 18. 2022) (Howell, C.J.)

(same); *United States v. Herendeen*, 21-cr-278 (D.D.C. Apr. 1, 2022) (Howell, C.J.) (same); *United States v. McCreary*, 21-cr-125 (D.D.C. Apr. 1, 2022) (Howell, C.J.) (same); *United States v. Reed*, 21-cr-204 (D.D.C. Apr. 14, 2022) (Howell, C.J.) (same); *United States v. Watrous*, 21-cr-627 (D.D.C. Apr. 21, 2022) (Howell, C.J.) (same); *United States v. Vuksanaj*, 21-cr-620 (D.D.C. Apr. 29, 2022) (Howell, C.J.) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Christopher Cunningham to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      /s/ Samuel S. Dalke
        SAMUEL S. DALKE
        PA Bar No. 311803
        Assistant United States Attorney, Detailee
        U.S. Attorney's Office
        601 D Street, NW
        Washington, D.C. 20001
        Office: 77-515-4095
        Samuel.S.Dalke@usdoj.gov