1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

2
————————————————————

3    United States of America,    ) Criminal Action
                                  ) No. 1:21-cr-00603-RC
4                    Plaintiff,   )
                                  ) **Sentencing** (via Zoom)
5    vs.                          )
                                  )
6    Christopher Michael Cunningham, ) Washington, D.C.
                                  ) **June 27, 2022**
7                    Defendant.   ) Time:  10:00 a.m.
     ————————————————————

8
                **Transcript of Sentencing** (via Zoom)
9                      **Held Before**
            **The Honorable Rudolph Contreras** (via Zoom)
10              **United States District Judge**

11
                    A P P E A R A N C E S

12
     For the Government:    **Samuel Dalke**
13   (via Zoom)             DEPARTMENT OF JUSTICE
                            UNITED STATES ATTORNEY'S OFFICE
14                          228 Walnut Street, Suite 220
                            Harrisburg, Pennsylvania 17101

15
     For the Defendant:     **Dumaka Shabazz**
16   (via Zoom)             FEDERAL PUBLIC DEFENDER
                            810 Broadway, Suite 200
17                          Nashville, Tennessee 37203

18   Also Present (via Zoom):
                            Jessica Reichler, Probation Officer
19   ——————————————————————————————————————————————

20   Stenographic Official Court Reporter:
     (via Zoom)             Nancy J. Meyer
21                          Registered Diplomate Reporter
                            Certified Realtime Reporter
22                          333 Constitution Avenue, Northwest
                            Washington, D.C. 20001
23                          202-354-3118

24

25

1                  P R O C E E D I N G S

2              (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3      limitations of technology associated with the use of
technology, including but not limited to telephone and video
4      signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5      reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7              THE COURTROOM DEPUTY:  Judge, this is Criminal Action

8      21-603, United States v. Christopher Michael Cunningham.

9              For the United States, I have Samuel Dalke.  For

10     Defendant, I have Dumaka Shabazz.  Our court reporter today is

11     Nancy Meyer, and our probation officer is Jessica Reichler.

12             All parties are present.

13             THE COURT:  Good morning, everybody.

14             THE DEFENDANT:  Good morning, Your Honor.

15             MR. SHABAZZ:  Good morning.

16             MR. DALKE:  Good morning.

17             THE PROBATION OFFICER:  Good morning.

18             THE COURT:  I gather we're here for the sentencing of

19     Mr. Cunningham; is that right?

20             MR. SHABAZZ:  Yes, Your Honor.

21             THE COURT:  Okay.  So let's start with the CARES Act

22     colloquy for proceeding by video.  The Chief Judge in this

23     district has authorized the use of videoconferencing for

24     sentencings because they cannot be conducted in person safely

25     without seriously jeopardizing public health and safety.  We're

1    prepared to proceed today by videoconference for this hearing.

2         Mr. Shabazz, does your client believe that proceeding

3    today via videoconference rather than waiting until God knows

4    when, when a hearing can be safely held in person is in the

5    interests of justice?

6         MR. SHABAZZ:  Yes, Your Honor.

7         THE COURT:  Okay.  Could you briefly say why it makes

8    sense to have him proceed today by videoconferencing rather

9    than waiting for an indefinite period until COVID subsides?

10        MR. SHABAZZ:  Yeah.  Yes, Your Honor.  For one, the

11   uncertainty of when that would actually happen, when he would

12   be able to get sentenced.  Also, for the -- even just for the

13   Court, the government, and Mr. Cunningham, it's more effective

14   to go ahead and be prepared and move forward.  All parties have

15   filed the documents.  And Mr. Cunningham, for him, the stress

16   and uncertainty of this hanging over his head is certainly

17   worth going forward instead of waiting to see whenever we'd be

18   able to do this in person.

19        THE COURT:  Okay.  Mr. Dalke, do you have a contrary

20   view?

21        MR. DALKE:  No, Your Honor.  And the government's

22   ready to proceed by videoconference.

23        THE COURT:  All right.  Mr. Cunningham, do you agree,

24   after having consulted with your counsel, to participate in

25   today's sentencing hearing using videoconference rather than

1    being physically present in the courtroom?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  Are you comfortable with the

4    videoconferencing equipment made available to you?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  All right.  And this Zoom technology that

7    we're using for this hearing allows us -- if you want to have a

8    private conversation with your counsel, for the courtroom

9    deputy to put you and him in a separate virtual conference

10   room, breakout room, so that you and he can have that

11   conversation in private without any of the other parties

12   hearing or listening to you during that conversation.  Do you

13   understand that process?

14             THE DEFENDANT:  Yes, sir, I do, Your Honor.

15             THE COURT:  So if at any point you want to have that

16   private conversation with your counsel, just let us know, and

17   we'll go ahead and put you in that separate breakout room.

18   Okay?

19             THE DEFENDANT:  Thank you, Your Honor.  I appreciate

20   that.

21             THE COURT:  All right.  The Court finds that the use

22   of VTC is necessary because it is not practical to appear in

23   person and proceeding by VTC today is justified because the

24   interests of justice will be harmed without a prompt hearing

25   and the defendant, after consultation with counsel, has

1      consented to proceeding in this fashion.

2          Mr. Cunningham and defense counsel, have you reviewed

3      the presentence report as revised following the defense and the

4      government's submissions?

5              MR. SHABAZZ:  Yes, Your Honor.

6              THE COURT:  Any additional objections or corrections?

7              MR. SHABAZZ:  No, Your Honor.

8              THE COURT:  Okay.  Under Federal Rule of Criminal

9      Procedure 32(i)(3)(A), the Court will accept the presentence

10     report as its findings of fact on issues not in dispute.

11         Defendant has pled guilty to a class -- Defendant has

12     pled guilty to a Class B, as in boy, misdemeanor to which the

13     sentencing guidelines do not apply.  Therefore, I will assess

14     and determine the proper sentence in this case by reference to

15     and in consideration of all the relevant factors pursuant to

16     the sentencing statute found at 18 U.S.C. 3553(a).

17         Defendant has pled guilty to Count 4, parading,

18     demonstrating, or picketing in a Capitol Building, in violation

19     of 40 U.S.C. § 5104(e)(2)(G).  Mr. Cunningham has minimal

20     criminal history resulting from automobile-related offenses

21     that include driving without a license or with a suspended

22     license and use of a stolen tag, all resulting in no or minimal

23     jail time, and none occurred more recently than eight years

24     ago.

25         The maximum term of imprisonment for this offense is

1    six months, maximum term of probation is five years, and the

2    maximum fine is $5,000.

3         Would the government like to address the Court regarding

4    sentencing?

5              MR. DALKE:  Yes, Your Honor.

6         The government's asking for a short term of imprisonment

7    in this case of Christopher Cunningham and would do so after

8    careful consideration of his actions on January 6 and in

9    comparison with the conduct of the other rioters that day.

10        This Court has previously heard the details and the

11   seriousness of the events and the violence on January 6th.  I'm

12   not going to repeat it here today for the Court.  It's suffice

13   to say that Mr. Cunningham took part in a hostile takeover of

14   the United States Capitol that constituted an unprecedented

15   attack on democracy and on the rule of law itself.

16        I do want to briefly touch on three significant points

17   that the government considered when comparing and weighing

18   Mr. Cunningham's conduct on January 6th with -- with that of

19   other rioters.  First would be the time and place of his entry;

20   second was his duration inside the Capitol; and third, and

21   finally, would be his actions after breaching or after entering

22   the Capitol.  And taken together, these -- these three points

23   and when placed in context of the events on January 6th, that's

24   why the government believes a short custodial sentence of

25   14 days followed by probation would be appropriate in this

1     case.

2          So the first point is the time and place of entry.

3     Mr. Cunningham entered at 2:20 p.m., which was approximately

4     7 to 8 minutes after the initial breach of the Capitol.  That's

5     depicted in Images 2 and 3 of the government's sentencing memo.

6     This was just 10 to 20 minutes after the rioters violently

7     overtook the northwest steps, the northwest terrace.

8     Mr. Cunningham was certainly not the first to enter, but he was

9     part of that initial wave.

10          It would have been impossible for him to have entered

11    when he did, where he did without him seeing the active police

12    resistance outside, witnessing the violent clashes, hearing the

13    chants, watching the rioters overrun the police, smelling the

14    pepper spray.  He could have turned back at any point,

15    Your Honor, but he chose to advance, and he chose to be on the

16    front lines of the breach of the Capitol.

17          I do want to note that he joined this mob ransacking the

18    Capitol despite being a former member of the United States

19    Navy.  You know, unlike many others there that day, his

20    military service would have made him well aware of the rule of

21    law and that he had no right to trespass through restricted

22    government buildings and restricted government grounds, and he

23    went forward anyway.

24          I also do want to note as to the time and place of entry

25    that -- at the same time that he entered, 2:20 p.m., it's

1    noteworthy because at that same time members of both the House

2    and the Senate were instructed and ultimately did evacuate

3    their chambers, and the joint session of Congress was

4    suspended.

5         The second point that I want to briefly talk about was

6    the duration of time inside the Capitol.  And this is what, in

7    part, distinguishes Mr. Cunningham's conduct from that of many

8    other rioters.  He unlawfully remained inside the Capitol for

9    90 minutes.  Most rioters that the government has seen, that

10   this Court has seen, has entered the Capitol for somewhere

11   between 10, 20, maybe 30 minutes in total duration.  He stayed

12   and he stayed and he stayed.  This wasn't something where you

13   got caught up in a moment.  He had a continued presence in that

14   Capitol for 90 minutes.  And he did -- he witnessed the

15   ransacking of the office of the Speaker of the House.

16        He observed other rioters shoving and shouting at

17   police.  You know, between 2:20 p.m. and 3:50 p.m., you know,

18   officers and rioters were injured, the certification of the

19   Electoral College vote count was interrupted, the offices were

20   looted, and the Capitol was ransacked.  A riot cannot occur

21   without other rioters.  A mob can only succeed because of its

22   numbers.  And his sustained participation in the riots and his

23   continued occupation of the Capitol is -- is considerable and

24   does weigh heavily.

25        Notwithstanding, the government certainly recognizes he

1    didn't prep.  You know, he didn't have the tactical gear that

2    some other rioters had.  He did not assault other officers like

3    some other rioters.  But, nonetheless, his sustained

4    participation on that day did further and encourage others.  It

5    did hamper the law enforcement's response who was trying to

6    contain rioters both inside and outside, trying to protect

7    themselves and staff.

8         THE COURT:  Tell me a little bit -- because I don't

9    think I've seen the video or been presented with the video of

10   this instance in which you indicated that the defendant with

11   others pinned an officer against the wall to prevent him from

12   intervening and stopping new entries through the door.

13        MR. DALKE:  Yeah, so I'm happy to expand on that.  So

14   the east Rotunda doors -- so -- so for context, Mr. Cunningham

15   entered through the west side; right?  He made his way to the

16   east side of the Capitol, and there's the east Rotunda doors.

17   And at 2:38 was, kind of, the major breach.  It had been

18   breached previously, but briefly.  But the major breach

19   happened at 2:38 p.m.

20        And -- and directly after that -- so rioters are coming

21   through those east Rotunda doors.  You can see Mr. Cunningham

22   on the video peering at and watching this incident.  This is

23   roughly around 2:40 p.m.  And there is an officer who is in

24   full riot gear with a face shield, you know, and, you know,

25   pads.  A law enforcement officer.  And other rioters, not

1      Mr. Cunningham, take him and push him and physically shove him

2      up against the wall and on the side.  And Mr. Cunningham joins

3      that group, and it's unclear -- I don't know, Your Honor,

4      whether he was maybe trying to assist, whether maybe he was

5      trying to keep that officer away.  But he was with that group

6      of four, five individuals that kept that officer cornered and

7      pushed, sidelined from the door at the same time that -- that

8      other rioters are coming into that door, including a column

9      of -- of five or six Oath Keepers, including other people with

10     gas masks, tactical helmets.

11         And -- and that breach point is considerable,

12     Your Honor, because as that day went forward, there's three

13     violent clashes in the Rotunda just off that, you know, within

14     the next 30, 45 minutes after that.  Six minutes after that --

15     you know those people are coming in -- that's when the Senate

16     Floor was breached.  So the people -- and -- and including

17     people coming through those east Rotunda doors.

18         He certainly had his hands on the officer at times.

19     But, again, it was not -- his conduct, it was not an assault.

20     I'm not in any way trying to suggest that.  He was there.  He

21     certainly witnessed others, you know, being more forceful with

22     that officer.  And through the screenshots that we've shown in

23     our sentencing brief at -- I think it's 8 and 9, Images 8 and

24     9, you can see the close proximity that he had to that officer

25     as well.

1          THE COURT:  All right.  Go ahead.

2          MR. DALKE:  So the third thing the government wants

3     to -- to outline for the Court was -- was Mr. Cunningham's

4     actions once inside the Capitol.  So when he breached early on

5     in the riot -- when he breached that Capitol at 2:20 p.m. -- he

6     filmed his entrance.  And you can see it, again, in those

7     images that's in the government's sentencing brief, that he's

8     got the phone up and he's turned around and -- and, you know,

9     filming his entrance.

10         And he also later posted photos on social media of

11    himself in the interior of the Capitol.  You know, clearly

12    proud of your actions.  You're -- you're displaying this for

13    your social network, for your friends, for others.  He

14    trespassed through the Rotunda, and he also trespassed --

15    unlike many, he trespassed through both the House and the

16    Senate sides -- so Senate wings -- of the United States Capitol

17    on that day.

18         And he penetrated all the way to the office of the

19    Speaker of the House where, as previously noted, he took and

20    posted a photo.  And, you know, that -- that's important

21    because, certainly, you're not allowed in the Capitol, period;

22    right?  This was all a trespass.  But he went into sensitive

23    spaces, you know, beyond just the main Rotunda and the main

24    spaces; right?  So, again, that -- that does weigh on the

25    government's, kind of, consideration with its sentencing

1     recommendation.  And it's important when you look at

2     comparative cases, cases where people have entered -- or kind

3     of breached or went to those sensitive spaces have received

4     higher sentences and generally have received custodial

5     sentences.

6          He also smoked a cigarette inside the Capitol.  Again,

7     I -- I don't have much context for that, other than it's on the

8     video and it's on the photographs.  Was it in celebration?  Was

9     in defiance?  Was it in disrespect?  Did he just want to smoke

10    a cigarette?  I don't know.  But he's in the Capitol smoking a

11    cigarette while he's trespassing.  And then, finally, as we've

12    already talked about, we talked about his involvement

13    sidelining an officer -- or surrounding an officer following

14    the breach of the east Rotunda doors at 2:40 p.m.

15          To sum it all up with -- with these three points

16    highlighted -- his entrance, his duration, his conduct -- it

17    becomes clear to the government that a period of probation

18    would not be a sufficient sentence for this defendant.  It

19    wouldn't account for the seriousness of the offense or the

20    aggravating factors laid out, and it wouldn't provide adequate

21    deterrence to Mr. Cunningham or to others going forward.  He

22    was a willing, active, and prolonged participant.  He joined a

23    very violent mob in overrunning the Capitol for over

24    90 minutes, and we're going to ask this Court -- the government

25    is asking this Court to impose a 14-day prison term followed by

1    three years' probation.

2         Thank you, Your Honor.

3              THE COURT:  All right.  Thank you.

4         Go ahead, Mr. Shabazz.

5              MR. SHABAZZ:  Thank you, Your Honor.

6         Your Honor, we -- you know, we interpret these a little

7    bit different.  Some of the things we want to highlight is

8    Mr. Cunningham went up there to D.C. to see what he believed

9    would be the last time he would hear a speech from the sitting

10   President, in which he supported, but he went up there strictly

11   for that.  No preparations; no clothes; no maps; no guns; zip

12   ties; walkie-talkies; anything in his travel to suggest that he

13   was there for something more nefarious.  He was not part of any

14   organization -- any violent organization that planned.  He was

15   not part of any violent organization that scoped out the

16   entrances; not part of any organization that inspired the

17   violent entrance into the buildings.

18        One thing that we point out with the entrance, what the

19   government says is true.  He arrived at about 7 minutes after

20   the breach.  He acknowledges that there were broken windows and

21   the door was open, the crowd going in.  And what Mr. Cunningham

22   explains is that two things that he never really realized is

23   that, one, how easy it is to get caught up in the moment in --

24   with others.  We also highlight that there were no violent

25   clashes.  The government points out he was in there for an hour

1   and a half.  And during that hour and a half, not a single

2   incident of violence, vandalism, destruction, or theft.  Again,

3   he had no map.  He's pretty much just following the -- the

4   crowd throughout the interior of the office.

5        Certainly, no planning, no filming.  I mean -- well, he

6   filmed himself, but he did not post it in a braggadocio manner.

7   It was posted in a private Facebook group with private people.

8   It was not fully open to the public.  And somebody did report

9   him from there.  When he had contact with the police on a

10  completely separate issue where he was calling the police

11  about -- when he was a victim, he openly admitted that to

12  police.  Openly admitted that he was in there, that he had

13  entered the Capitol.

14       And then he was given an information on September 28th,

15  and he pled on February 15th.  That -- you know, we still

16  hadn't even had all of the discovery at that point.  And

17  Mr. Cunningham was already ready to accept responsibility for

18  the actions that had occurred on the inside.

19       He also acknowledges he did smoke a cigarette inside,

20  Your Honor.  At that point what he explained is, you know, all

21  that he had seen in there, his nerves and anxiety was working

22  up and he was trying -- you know, at that point on his way out,

23  and he just couldn't help it.  He had been smoking cigarettes,

24  you know, for over a decade now.

25       And lastly, Your Honor, we end with -- we want to be

1     clear.  Mr. Cunningham was not in any way involved in any

2     violence or hindrance towards police.  The opposite of that

3     happened.  Mr. Cunningham was telling the people at that time,

4     stop, you know, don't do this.  And, sure, he didn't physically

5     intervene himself to save the officer, but he did encourage the

6     others with his voice and, kind of, actions of separating them

7     away from that.

8          And so, Your Honor, we believe for those reasons that

9     Mr. Cunningham, while he did participate in a larger rally and,

10    ultimately, a riot within the Capitol, he was not associated or

11    part of that.  And that came as part of the brewing and being

12    caught in the moment with the Capitol -- other rioters.

13    Your Honor, we do believe a sentence of probation is sufficient

14    in this.  It is a severe limitation on his rights.  And it will

15    be a restriction upon his movement and other aspects of his

16    general freedom.

17         For that, Your Honor, we ask for a sentence of

18    probation.

19         Thank you.

20         THE COURT:  All right.  So tell me a little bit more

21    about this incident that the government alleges that the

22    defendant was involved in, pinning that officer against the

23    wall.

24         MR. SHABAZZ:  Your Honor, there absolutely was chaos

25    during this period; and, really, all you can see is that

1   Cunningham and others are in this area.  There's no indication

2   at all that he knew those people, that he helped those people,

3   or that he even encouraged them to take the actions they did.

4   And he, certainly, is not seen shoving, pushing, or engaged in

5   any type of violence or even a violent attitude toward that

6   officer.

7           THE COURT:  Okay.  And what -- you know, one and a

8   half hours is the longest, by far, of any of the other folks

9   that I've sentenced in this matter.  Why did he stay in there

10  that long?

11          MR. SHABAZZ:  Your Honor, Mr. Cunningham explained to

12  me that, you know, once inside and just walking through with

13  the people -- at one point he didn't even know where -- most of

14  the time he had no idea where he was and there -- you know, so

15  he's just going through, following the crowd, going through

16  these areas.  And then at one point he finally sees people

17  going out.

18          And so the thing that we would point out, Your Honor, is

19  that although he was in there for a larger point in time, there

20  is not a single incident that the government or anybody can

21  point to wherein he opposed police directly, where he created

22  any type of damage or violence.  He's literally walking through

23  the Capitol.  We understand that, in the larger aspect, his

24  presence helped the crowd, but ultimately his individual

25  actions did not -- you know, were not supportive of the overall

 1     rioting done at the Capitol.

 2               THE COURT:  All right.  And one last question.

 3     Probation recommends that during any period of supervision that

 4     I impose a requirement that firearms be removed from the

 5     residence.  Do you take a position on that?

 6               MR. SHABAZZ:  Your Honor, may I just speak in --

 7     briefly with the client in the breakout?

 8               THE COURT:  Yes.  Go ahead.

 9          Tanya, can you put them in a breakout room?

10               THE COURTROOM DEPUTY:  Yes.  I'm doing that right

11     now, Judge.

12               MR. SHABAZZ:  Hey, Mr. Cunningham.

13               THE DEFENDANT:  Hey, Mr. Shabazz.

14               THE COURT:  Hold on.  You're not -- you're not in the

15     breakout room yet.

16               MR. SHABAZZ:  Sorry about that.  Here it is.  It's

17     coming now.

18               THE DEFENDANT:  I'm going to click join.  I still see

19     the judge.

20               THE COURTROOM DEPUTY:  Please click on join.

21               THE COURT:  Click join.

22               THE DEFENDANT:  I don't have that option now, guys.

23     I'm sorry.  Just a little confusing for me.

24               THE COURTROOM DEPUTY:  Okay.  Let's see if I can get

25     you -- I can't do it.  Hold on.  I have to close the room

1      again.

2                      THE DEFENDANT:  Your Honor, I see --

3                      THE COURTROOM DEPUTY:  Okay.  He's joined.

4                      (Off the record.)

5                      THE COURT:  All right.  Mr. Shabazz, did you have a

6      chance to talk to your client about that issue?

7                      MR. SHABAZZ:  I did, Your Honor, and he's -- we do

8      object to that.  Mr. Cunningham is a sports shooter, as a side

9      hobby.  He's also a hunter.  Both of those are very common here

10     in the South, in Tennessee.  You know, nothing in this case --

11     he was not involved in any firearms, had no firearms up there.

12     And so we would request that that not be a condition of his

13     probation.

14                     THE COURT:  All right.  I'll take your objection

15     under consideration.  I'll give the government a chance to

16     address it, if you wish.

17                     MR. DALKE:  Briefly, Your Honor, just to say, I do

18     think it would be an appropriate penalty to consider in this

19     case.  I don't think shooting for leisure is -- you know,

20     outweighs the conduct that he did at the Capitol and fitting an

21     appropriate sentence.  I do think it should be on the table.

22                     THE COURT:  Okay.  Let me ask this question,

23     Ms. Reichler.  The way that the supervision requirement is

24     worded, it seems to prevent the keeping of the weapons in the

25     residence to protect the probation officers during any home

1    visit.  Does it prohibit a defendant from keeping the weapons

2    at, let's say, a relative's house and then going out and doing

3    the sports -- the gun sports with the relatives but then -- but

4    not keeping it at the residence?

5              THE PROBATION OFFICER:  No, Your Honor.  That's

6    correct.  He can keep it at a relative's residence, and that's

7    fine.

8              THE COURT:  Okay.  It's just to protect the probation

9    officers during the home visits?

10             THE PROBATION OFFICER:  Correct.  Correct.

11             THE COURT:  Okay.  I've got a better understanding of

12   the requirement.  I'm inclined to impose it because, you know,

13   there's a whole lot of these January 6th defendants, some of

14   whom have antigovernment views, and the probation office is --

15   is concerned -- and I think rightfully so -- of visiting homes

16   where this may be an issue.  So as a prophylactic measure, I'm

17   going to impose that requirement.

18        It doesn't -- as we discussed, it won't prevent

19   Mr. Cunningham from going out hunting or to -- to doing the

20   shooting sports.  It just prohibits him from keeping those

21   weapons at his residence in order -- for the safety of the

22   probation officers when they conduct a home visit.

23        All right.  Mr. Cunningham, I'll give you an opportunity

24   to speak on your own behalf, if you wish to.

25             THE DEFENDANT:  I do.  I would like to say a few

1    things, Your Honor.  I did write a statement, and then I have a

2    few things to add to that statement in light of this morning.

3         After much introspection, I have realized a few things.

4    One, how easy it is to minimize one's accountability; and two,

5    how easy it is to lose one's self in a moment.

6         Having learned these lessons, Your Honor, I do accept

7    responsibility for my actions and behaviors on January the 6th,

8    and I do apologize to the Court and to those present in the

9    Capitol Building.  I'm not making excuses.  I didn't know that

10   we were interrupting the count.  I didn't know that -- in my

11   mind -- I was angry.  And in my mind, I honestly thought that

12   we were going to end up on the Senate balcony speaking our mind

13   and probably thrown out.

14        The gravity of what I've seen around me -- and, you

15   know, especially in light of my upbringing and kind of the ways

16   I'd grown up -- I didn't realize the -- the links and the --

17   the things that had happened, the depth of them.  It didn't

18   cross my mind that people were being hurt physically,

19   emotionally, mentally.  What I saw was a lot of pushing and

20   shoving and confusion and yelling and -- and -- I've never

21   participated in a protest or a riot.  I honestly -- I think I

22   tried to sugarcoat it within the moment because I was so angry,

23   and I just wanted to be heard.

24        I had no idea that my actions were causing an evacuation

25   and people were in fear of their lives.  It's not anything

1    that, you know, I would ever be proud of.  I didn't even

2    understand that I was committing a crime.  I thought I was part

3    of a protest.  Now, I did witness crimes around me, Your Honor.

4    But I was of the opinion that if I didn't break things, if I

5    didn't clash with the police, if I didn't, you know, damage the

6    property, that it would -- that I was within my rights; that it

7    set me aside or above or away from those that were doing those

8    things.

9         On multiple occasions while I was within the building --

10   once in Speaker Pelosi's office, someone smashed a mirror.  I

11   spoke up and said, "Man, that's not what we're here to do."

12   You know, me and another gentleman removed her family pictures

13   off the wall and placed them behind the couch because someone

14   was trying to destroy them.  It was a big, long photograph of

15   her and children.

16        With the -- with the Capitol officer that was there, I

17   heard another gentleman yelling at someone, like right by me.

18   When I turned around, I thought I observed someone reaching for

19   a pistol that was on the officer's thigh.  I yelled at people

20   to leave him alone, and I swatted at a person, at which point

21   me and -- I don't know who the guy was -- we did our best to

22   try to get between the officer and what we thought were people

23   assaulting that officer.  At no point were we intending to try

24   to keep someone -- you know, the officer from a door, anything

25   like that.  Our intentions were to protect this guy.  He -- he

1    was outnumbered five, six to one, something like that, and we

2    did our best to kind of get in between that.

3          I'm -- I'm shaking.  Excuse me.

4          Now, again, I did witness some crazy things in there,

5    but I thought as long as I didn't participate in that, that I

6    would make it to that balcony and my voice would finally get

7    heard.  I do understand now that I was incorrect, and I know

8    that then -- that's no excuse, nor do I intend to make any

9    excuse.  I was angry, and I wanted to be heard.  I wish I'd

10   honestly never gone on that property.

11         Again, I -- I'm sorry.  I apologize.  If I had this to

12   do over again, I still would have went and listened to

13   President Trump's speech, but I would have went home instead of

14   going to the Capitol Building.

15         That's all I've got, Your Honor.

16         THE COURT:  All right.  Thank you.

17         So let's start with the financial issues.  So as part of

18   the plea, the defendant has agreed to pay the Clerk of the

19   Court, to be forwarded to the Architect of the Capitol, $500 as

20   restitution for the damage conducted in the Capitol Building

21   that day.

22         And the fine, the maximum fine, is $5,000.  Probation

23   has indicated that the defendant has an ability to pay a fine

24   but does not recommend one.  That's a little bit unclear to me.

25   But the defendant is gainfully employed and provided financial

1    information that allows the Court to assess his ability to pay.

2    Accordingly, I'm going to impose a modest fine to help offset

3    the government's cost to supervise the defendant, both pretrial

4    and as part of his probation.  So I'm going to impose a fine of

5    a $1,113, which covers a handful of months of the supervision.

6    This amount takes into consideration that the defendant helps

7    provide for a special-needs daughter.  So I didn't impose the

8    full amount.

9         The Court is to impose a fine sufficient but not greater

10   than necessary to comply with the purposes of the subsection.

11   I need to consider the nature and circumstances of the offense

12   and the history and characteristics of the defendant and impose

13   a sentence that reflects the seriousness of the offense,

14   promotes respect for the law, and provides just punishment for

15   the offense.

16        Of course, the offense is serious.  A number of my

17   colleagues have spoken eloquently about this.  Defendant took

18   part in a mob riot that took place at the Capitol on

19   January 6th, 2021.  Many of the rioters engaged in violence,

20   and some destroyed property, which the defendant witnessed

21   firsthand.  I have watched numerous videos of rioters engaging

22   in hand-to-hand combat with police officials.  It was not a

23   peaceful event.

24        More than a hundred law enforcement officers were

25   injured on that day.  Moreover, the Capitol sustained over

1   $1.5 million in property damage.  Many of the rioters intended

2   to block the certification of the votes for President

3   Joe Biden, and although the rioters failed to block the

4   certification, they delayed it for several hours.  The security

5   breach forced lawmakers to hide inside the House gallery until

6   they could be evacuated to undisclosed locations.

7          In short, the rioters' actions threatened the peaceful

8   transfer of power, a direct attack on our nation's democracy.

9          With that said, no evidence has been presented that

10  shows the defendant assaulting law enforcement or destroying

11  property.  After entering the Capitol building, only seven

12  minutes after the initial breach of the Senate wing door, the

13  defendant wandered throughout the entire complex for one and a

14  half hours, covering both the Senate and the House sides of the

15  building, and making his way into the off-limits House

16  Speaker's office.

17         So there's this allegation with respect to the defendant

18  cornering an official -- an officer and pinning him against the

19  wall to prevent him from performing his duties.  That video was

20  never presented to me; so I can't make my own assessment.  And

21  there's conflicting accounts of what was actually occurring

22  there.  The government's presentation is a bit ambiguous as to

23  Defendant's specific role and actions there.  So I won't hold

24  that against the defendant.

25         Mr. Cunningham's lengthy period of time in the complex,

however, complicated the process of clearing the building of

rioters in order to complete the certification.  He also posted

photos of his actions on that day on social media, exhibiting

an apparent sense of pride in what had occurred.  The riot was

successful in delaying the certification in large part because

of the numbers of participants involved, which simply

overwhelmed the outnumbered law enforcement officers present.

Because the defendant contributed to these numbers, he has to

be held accountable for his actions and the results to which

his actions contributed.

To his credit, he pleaded guilty at an early juncture.

As previously indicated, Defendant has minimal criminal

history, and he has no history of violence.  He's a 47-year-old

man with a high school diploma and an associate's degree.  He

appears to have been gainfully employed all of his adult life,

earning a decent salary as a chef and later as a self-employed

golf cart taxi driver and construction worker, home renovator.

He also served in the Navy from 2008 to 2010 when he was

honorably discharged.

Defendant's childhood was difficult after moving from

place to place as a young child due to his father's military

career.  He became a ward of the state when his father was away

from home as part of the trucking industry and his mother was,

unfortunately, institutionalized due to mental health

challenges.  He was in the foster care system for six years

1     where he and a sister suffered from various types of abuse.

2         Defendant has been in a series of romantic

3     relationships, three of which have resulted in a child.  One of

4     these children has special needs, for which Defendant

5     contributes some financial support.  However, Defendant has

6     been in a stable relationship for the past ten years.  He does

7     appear to have a sufficiently stable home and work environment

8     and familial support to facilitate his rehabilitation.

9         The Court is to impose a sentence that affords adequate

10     deterrence to criminal conduct, protects the public from

11     further crimes of the defendant.  The events of January 6th

12     involve the rather unprecedented confluence of events spurred

13     by then-President Trump and a number of his prominent allies

14     who bear much responsibility for what occurred on that day.

15         Since his arrest, Defendant seems to have done well

16     while on release status.  Due to his minimal criminal history

17     and no evidence of violence, the Court is confident that

18     Mr. Cunningham is unlikely to reoffend, will not be emotionally

19     swept up in irrational actions, and will not be a risk to the

20     public in the future.  With respect to general deterrence, the

21     Court does not believe that incarceration is necessary to deter

22     other nonviolent protesters from crossing the line into

23     lawbreaking.

24         The defendant's ordeal through the criminal justice

25     system, restitution, a fine, community service, and probation

1    with a limited period of home confinement should serve as an

2    adequate deterrent to those that can be deterred, although I

3    suspect that many of the folks involved on that day would not

4    be deterred regardless of what I do today.

5         The Court is to impose a sentence that provides the

6    defendant with needed educational or vocational training,

7    medical care or other correctional treatment in the most

8    effective manner.  Nothing in this respect has been brought to

9    my attention.

10        The Court is to consider the kinds of sentences

11   available.  With the nature of the crime and the defendant's

12   minimal criminal history and lack of violence, the Court is

13   considering a period of probation that contains restrictions

14   and imposes home confinement for a short period of time.  Even

15   if the Court were inclined to consider a short term of

16   incarceration, it does not believe that it would be prudent to

17   impose that during the COVID pandemic.

18        The Court is to impose a sentence that takes into

19   consideration the sentence and the sentencing range established

20   for the applicable category of offense committed by the

21   applicable category of defendant as set forth in the

22   guidelines.  The Court is cognizant that the guidelines do not

23   apply here, and no pertinent policy statements issued by the

24   Sentencing Commission have been brought to my attention.

25        The Court is to impose a sentence that avoids

1    unwarranted sentence disparities among defendants with similar

2    records who have been found guilty of similar conduct.  The

3    government has provided a chart that lists a number of the

4    January 6th defendant sentencings, but there's not enough

5    granular information there to make apt comparisons.  However,

6    the list does make it clear that the government has recommended

7    noncustodial home confinement probation sentences in a number

8    of these cases, and the Court finds it hard to distinguish this

9    case from those.

10           The Court intends to impose a sentence in terms of

11   length, a period of probation, and term of home detention

12   commensurate with other nonviolent January 6th defendants with

13   little or no criminal history I have previously sentenced.

14           The aggravating facts here with respect to these

15   comparators are the -- as I indicated, the 1.5 hours that the

16   defendant spent inside the building, which is much longer than

17   some of the other defendants.  I've -- or I should say, longer

18   than all of the other defendants I've sentenced.  And the entry

19   into the private House Speaker's office, which is an

20   aggravating factor that most of the others did not take part

21   in.

22           As I indicated earlier, we've already dealt with that

23   restitution of $500, and I'll go ahead and order that.

24           I will now indicate the sentence to be imposed but give

25   counsel one more opportunity to make any legal objections

1    before the sentence is actually imposed.

2            Mr. Shabazz, do you have any objections to any of the

3    factors I've considered?

4            MR. SHABAZZ:  No, Your Honor.

5            THE COURT:  Mr. Dalke?

6            MR. DALKE:  No, Your Honor.

7            THE COURT:  All right.  Mr. Cunningham, it is the

8    judgment of the Court that you, Christopher Michael Cunningham,

9    are hereby sentenced to serve a 12-month term of probation on

10   Count 4.  This term of probation shall include a three-month

11   term of home confinement location monitoring to start from the

12   time are you fitted with the GPS equipment.  So this -- this

13   actually became an issue in one of my prior cases in which

14   there was an argument as to whether -- when the time of home

15   confinement begins.  So I want to make it clear that it's from

16   the time you're fitted with the GPS equipment, not from today's

17   date.

18           You are further ordered to pay a special assessment of

19   $10 as required by statute.  The Court finds that you have a

20   limited ability to pay a fine and, therefore, imposes a fine of

21   $1,113.  You are ordered to make restitution through the

22   clerk's office to the Architect of the Capitol in the amount of

23   $500.  These financial obligations shall be paid at a rate of

24   no less than $135 per month.  The special assessment and

25   restitution are payable to the Clerk of the Court for the --

1    for the U.S. District Court, District of Columbia.

2        Within 30 days of any change of address, you shall

3    notify the Clerk of the Court of the change until such time as

4    the financial obligation is paid in full.  I -- due to the

5    limited ability to pay, I waive any interest on either the --

6    that accrues on the special assessment, fine, and restitution.

7        While on supervision, you shall not use -- while on

8    supervision, you shall not commit another federal, state, or

9    local crime, and you shall not use or possess an illegal

10   controlled substance.  You shall also abide by the general

11   conditions of supervision adopted by the probation office,

12   which will be set forth in the judgment and commitment order,

13   as well as the following special conditions:

14       Number one is the location monitoring requirement; that

15   it gives the probation office the discretion with respect to

16   the technology it uses, either radiofrequency or GPS

17   monitoring, or some other technology.  And you're required to

18   abide by all those technology requirements for the period of

19   three months from the date you are fitted with the device.

20   That form of location monitoring technology is ordered to

21   monitor the restrictions on your movement in the community, as

22   well as other court-imposed conditions of release.

23       So for that three-month period, you're restricted to

24   your residence at all times except for employment; education;

25   religious services; medical, substance abuse, or mental health

1    treatment; attorney visits; court appearances; or court-ordered

2    obligations that include the requirement of community service

3    that I'm about to impose; and other activities as preapproved

4    by the probation office.

5          There's a financial information disclosure requirement

6    that -- during the period of time that the financial

7    requirements are outstanding.  And with respect to community

8    service, you must complete 60 hours of community service within

9    6 months.

10         The probation office will supervise the participation in

11   the program by approving the program, and you must provide

12   written verification of the completed hours through the

13   probation officer.

14         As I previously indicated, there's that firearm

15   restriction, which you shall remove firearms, destructive

16   devices, or other dangerous weapons from areas of your

17   residence over which you have access or control until the term

18   of supervision expires.

19         Counsel, any reason other than those previously stated

20   and argued why the sentence should not be imposed as just

21   stated?  Mr. Shabazz?

22              MR. SHABAZZ:  No, Your Honor.

23              THE DEFENDANT:  Actually, Mr. Shabazz, can we speak

24   for just a moment?

25              MR. SHABAZZ:  Okay.  Yep.

1          (Off the record.)

2          THE COURT:  All right.  Everyone is back.

3     Mr. Shabazz.

4          MR. SHABAZZ:  Yes, Your Honor.  The only --

5     Mr. Cunningham asked about a clarification.  He has two more

6     out-of-town work obligations.  One is in July.  One is in

7     October.  Traditionally down here, the supervising office, he

8     just lets them know, gives them the details.  And whatever

9     requirements -- if they need him to call while he's out of

10    town -- he does that.  But he just wanted me to ask to make

11    sure that that would not -- that the home confinement would not

12    prevent him from being able to work.

13         THE COURT:  Right.  So the -- there's two provisions

14    of the home confinement that I think would apply there, which

15    is he's restricted to his residence at all times, and then it

16    says except for employment, and then it also says or other

17    activities as preapproved by the probation office.  So as long

18    as the probation office approves it and it's for employment, I

19    think that's in compliance with the requirement.

20         MR. SHABAZZ:  Okay.  Thank you, Your Honor.  We just

21    wanted to clarify.

22         THE COURT:  All right.  Mr. Dalke, any objections to

23    the sentence as stated to be imposed?

24         MR. DALKE:  No, Your Honor.

25         THE COURT:  All right.  I will impose the sentence as

1       I indicated.

2               I gather that there are charges to be dismissed.  The

3       defendant pleaded to one count of the four-count information.

4       Do we need to dismiss Counts 1 through 3?

5               MR. DALKE:  Yes, Your Honor.  And the government

6       would move to dismiss Counts 1 through 3 of the information.

7               THE COURT:  Okay.  We'll go ahead and take care of

8       that as part of the joint -- the judgment and commitment order.

9               So, Mr. Cunningham, you were convicted by a plea of

10      guilty.  You can appeal your conviction if you believe your

11      guilty plea was somehow involuntary or if there's other -- or

12      some other fundamental defect in the proceedings that was not

13      waived by your guilty plea.  I note that your guilty plea had a

14      pretty substantial waiver of appellate rights and collateral

15      attack rights.  So to the extent you're inclined to appeal,

16      talk to your attorney about that.  You may have waived certain

17      things you can appeal, but -- but talk to him about that, if

18      you're inclined.

19              You might also have a statutory right to appeal under

20      your sentence under certain circumstances that were not waived.

21      So you can discuss those with him as well.

22              If you do choose to appeal, you have the right to apply

23      for leave to appeal in forma pauperis, which means without

24      payment of costs.  And if you request and qualify, the Clerk of

25      the Court will prepare and file a notice of appeal on your

1    behalf, although I note that you're represented by very able

2    counsel who can assist you in that process.  But most

3    importantly, with few exceptions, any notice of appeal must be

4    filed within 14 days of the entry of the judgment.  It usually

5    takes a couple days to get the judgment up on the docket.  So

6    after that, you have 14 days to appeal, if you so choose.

7            So probation has recommended the transfer of

8    jurisdiction for the probation supervision to the Middle

9    District of Tennessee.  Mr. Shabazz, do you have an objection?

10   Does the defendant have an objection to that?

11           MR. SHABAZZ:  No, Your Honor.  We'd appreciate that.

12           THE COURT:  Okay.  We'll go ahead and do that as soon

13   as probation submits the paperwork to me.

14           THE PROBATION OFFICER:  And, Your Honor, I ask that

15   we have a breakout room after so I can go over the special

16   conditions with Mr. Cunningham again.

17           THE COURT:  Tanya, are they able to do that?

18           THE DEFENDANT:  Yes, sir.

19           THE COURTROOM DEPUTY:  Ms. Reichler, we actually have

20   another hearing immediately -- not immediately, but --

21           THE PROBATION OFFICER:  Okay.  Then I will get in

22   touch with them.

23           MR. SHABAZZ:  We can arrange -- we can arrange one,

24   yep.

25           THE COURTROOM DEPUTY:  Okay.

1          THE COURT:  All right.  Anything else?

2          THE DEFENDANT:  I'm available.

3          THE COURT:  Anything else we need to cover today,

4    Mr. Shabazz?

5          MR. SHABAZZ:  None from the defense, Your Honor.

6    Thank you.

7          THE COURT:  Mr. Dalke?

8          MR. DALKE:  No, Your Honor.  Thank you.

9          THE COURT:  All right.  Mr. Cunningham, good luck to

10   you, sir.  I'm hopeful that I will never see you again.  So

11   good luck.

12         THE DEFENDANT:  Thank you, sir.  Thank you, Your

13   Honor.  I appreciate you very much.

14         THE COURT:  All right.  Good luck.

15         (Proceedings were concluded at 10:59 a.m.)

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, Nancy J. Meyer, Registered Diplomate Reporter,

4        Certified Realtime Reporter, do hereby certify that the above

5        and foregoing constitutes a true and accurate transcript of my

6        stenograph notes and is a full, true, and complete transcript

7        of the proceedings to the best of my ability.

8

9                          Dated this 15th day of July, 2022.

10

11                         /s/ Nancy J. Meyer
                           Nancy J. Meyer
12                         Official Court Reporter
                           Registered Diplomate Reporter
13                         Certified Realtime Reporter
                           333 Constitution Avenue Northwest
14                         Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25